Karyn **RIDGEWAY**, et al., Plaintiffs,

v.

**MONTANA HIGH SCHOOL ASSOCIATION, et al.,**
Defendants.

No. CV 82–59–M–CCL.

United States District Court,
D. Montana,
Missoula Division.

May 8, 1986.

See also, D.C., 638 F.Supp. 326.

Mark S. Connell, Baldassin, Connell & Beer, Missoula, Mont., Stephen L. Pevar, ACLU, Denver, Colo., Susan M. Rogers, Wright, Lindsey & Jennings, Little Rock, Ark., for plaintiffs.

Ron Waterman, Gough, Shanahan, Johnson & Waterman, Rick Bartos, John W. Larson, Helena, Mont., for defendants.

## OPINION AND ORDER

LOVELL, District Judge.

This is a class action brought by certain Montana high school girls and their parents seeking relief from alleged sex discrimination in the secondary athletics program in the state of Montana.

The complaint was filed on May 11, 1982, alleging violations of plaintiffs' rights guaranteed by the Fourteenth Amendment to the United States Constitution, by Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681, *et seq.*), and by the Constitution and laws of the state of Montana. Plaintiffs sought declaratory and injunctive relief, as well as damages pursuant to 42 U.S.C. § 1983. Named as defendants were the Montana High School Association, an incorporated non-profit organization comprised of public and private secondary schools in Montana; its executive secretary, Dan L. Freund; the Montana Office of Public Instruction and its superintendent, Ed Argenbright; the Missoula County High School District; Whitehall High School District No. 2; Columbia Falls High School District No. 6; and the chairpersons of the school boards of the three named districts. Each of the three named plaintiffs was a student at one of the defendant high schools at the time suit was filed.

Plaintiffs allege that they have been deprived of an equal opportunity to participate in extracurricular high school athletics resulting in denial of the opportunity to develop to their full educational potential, in violation of state and federal law. Discrimination is alleged to exist in the number of sanctioned sports available, the seasons in which sports are available, the length of sport seasons, scheduling of practices and games, access to facilities, equipment, coaching, transportation, school band

and other forms of team support, uniforms, access to trainers, publicity, and other aspects of extracurricular athletics.

In June, 1983, the Court entered an order finding class certification appropriate pursuant to Rule 23, Fed.R.Civ.P. The class of plaintiffs was defined as:

All female students enrolled at Hellgate High School in Missoula, Montana, Whitehall High School in Whitehall, Montana, and Columbia Falls High School in Columbia Falls, Montana, as of the date of filing of the complaint in this action and all such female students who may enroll in said schools in the future.

The Court limited recovery of the plaintiff class to declaratory and injunctive relief and precluded the award of any monetary damages.

Defendants initially resisted this Court's jurisdiction over the subject matter of the action and raised many affirmative defenses to the complaint, including failure to exhaust administrative remedies, failure to join indispensable parties, immunity from suit, and failure to state a claim upon which relief could be granted. The Court denied motions to dismiss filed by defendants Office of Public Instruction (OPI) and Whitehall School District No. 2.

On June 20, 1984, an order of dismissal was entered by stipulation, incorporating therein a Settlement Agreement between the parties. By the order of dismissal without prejudice, the Court approved the parties' agreement and retained continuing jurisdiction to enforce the same.

The terms of the Settlement Agreement were negotiated and accepted by the parties in an effort to resolve the plaintiffs' claims in a workable manner without protracted litigation. Instrumental in the development of this Agreement was the Facilitator appointed by the parties, Barry Gomberg of the Mountain West Sex Desegregation Assistance Center, Weber State College, Ogden, Utah. The Agreement provided that the defendants would each submit a plan for implementation of settlement to the Facilitator, who would conduct a factual investigation and submit findings and recommendations to the Court. The Agreement further set forth in detail statewide and local minimum requirements for athletic programs and the duties of the defendants to secure compliance therewith. Although only three school districts had been named as defendants, the Agreement contemplated compliance by all school districts within Montana through the statewide efforts of the High School Association and OPI.

Additionally, by the terms of the Settlement Agreement plaintiffs and the Montana High School Association (MHSA) agreed to submit to the Facilitator the sole remaining area of contention between the parties. This issue concerned the seasonal placement of girls' basketball and volleyball, leaving to the Facilitator the determination of whether a seasonal change of the two activities was appropriate.

On December 19, 1984, the Facilitator submitted a report to the Court of his findings and recommendations on the "Seasons Issue." In essence, the Facilitator found the present seasonal alignment disadvantageous to girls in Montana, but concluded that many of the inequities in the high school athletic programs could be addressed within the current seasonal structure. Adopting the recommendations of the Facilitator, the Court ordered that planning was to commence immediately to implement a seasonal change in girls' volleyball and basketball to commence in the 1986–87 school year, but that the MHSA would have the opportunity to challenge the necessity of such a change through a review procedure to be held during the 1985–86 school year.

At its annual meeting in January, 1986, the membership of the MHSA voted to initiate the review procedure to attempt to prove that a change in the girls' basketball and volleyball seasons is unnecessary.

Hearing on this issue commenced March 31, 1986, and continued through April 7, 1986, after which the Court allowed ten days for submission of briefs and proposed

findings of fact and conclusions of law.[1] The Court has received all parties' submissions.

## ISSUES AND JURISDICTION

As originally framed in the complaint, the issues in this action involved allegations of widespread sex discrimination permeating virtually every aspect of the high school athletics program in Montana. Regrettably, as the case has developed, the parties have concentrated on the single issue of seasons placement. Indeed, much of the testimony was directed toward the reasons supporting · or opposing a seasons change and the impact on the students and programs were such a change to be ordered. Of course, the Court's jurisdiction—once invoked—is not restricted to just those matters the parties may choose to argue.

Despite the narrow focus of the hearing, the following issues remain to be determined:

1. In view of the interests and abilities of Montana's high school students, are male and female students receiving an equal opportunity to participate in extracurricular athletics at the high school level?

2. If equal opportunities are not being afforded to students of both genders,

> (a) should the Court order that girls' volleyball be played during the fall sport season, and/or that girls' basketball be played during the winter sport season?
> (b) Should the Court take other action to achieve equality?

There are many underlying related questions, but generally these two issues represent the culmination of the four years of this civil rights litigation. This Court has jurisdiction over plaintiffs' federal constitutional claims pursuant to 28 U.S.C. § 1343(3). The Court may seek guidance from the provisions and principles of Title IX and the regulations promulgated thereunder, although subject matter jurisdiction may not be premised on Title IX for the reason that jurisdictional prerequisites have not been established. *See,* 20 U.S.C. §§ 1682, 1683.[2] The Court has pendent jurisdiction over plaintiffs' state law claims pursuant to *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).[3]

District Courts are vested with broad equity jurisdiction in civil rights cases, and are to be guided by "equitable principles." *Brown v. Board of Education,* 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). Once judicial authority is invoked, " 'the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.' " *Milliken v. Bradley,* 433 U.S. 267, 99 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (citation omitted). The Court seeks to exercise this broad authority in a manner which will best serve the interests of justice and effectuate the goals of the Settlement Agreement.[4] I approve of the substance and objectives of the settlement between the parties; however, this

1. The defendant school districts and their board chairpersons did not participate in the review process.

2. Any questions as to the court's jurisdiction over particular parties have been waived by virtue of the Settlement Agreement.

3. Exercise of pendent jurisdiction over claims based on state law is proper where: (1) there is a common nucleus of operative fact between the state and federal claims; (2) the claims are such that the plaintiff would ordinarily be expected to try them together; and (3) the federal claims are substantial and not frivolous. *See also, Carreras v. City of Anaheim,* 768 F.2d 1039, 1042 n. 1 (9th Cir.1985).

4. *See* Ridgeway Settlement Agreement at pp. 2–3:

> The thrust and overall intent of this Settlement Agreement is to advance the opportunities which female high school students have to participate in extracurricular athletic events relative to their male counterparts; to create, implement and enforce minimum requirements for obtaining sex equity in athletics in Montana; and to make available established grievance procedures and forums, and permit students experiencing sex inequities to obtain non-judicial relief, while retaining the availability of alternative redress through remedies extended by state and federal law.

Court is in no way bound by the parties' agreement as to the seasons issue. Such private agreement cannot limit the Court's jurisdiction.

## REVIEW OF EVIDENCE

*Defendants' Case in Chief*[5]

As its first witness MHSA called its Executive Secretary, Dan L. Freund, who testified to the purposes and functions of the MHSA and to the composition of Montana's high school districts. Mr. Freund further testified to MHSA's role in the instant litigation and to the efforts the Association has made to comply with the terms of the Settlement Agreement. The remainder of the defendants' case in chief consisted of the following witnesses:

Lynda Kay Steele. Ms. Steele, a statistician at Montana State University, testified to the several charts she had developed illustrating the numbers of girls' and boys' sports offered in Montana high schools as reported by the schools in the two self-assessment surveys. Ms. Steele further testified to projections made from the data contained within the survey reports and how those projections were determined.

Vernal Dennis Seefeldt. Dr. Seefeldt, a faculty member at Michigan State University and director of the Youth Sports Institute in the state of Michigan, testified to his studies of athletic ability and involvement of both boys and girls, and to his professional opinion regarding the important elements of providing equal athletic opportunity for youth of both genders.

Kari Kockler. Ms. Kockler, a senior at Helena High School, Helena, Montana, testified to her experiences as an athlete in a Class AA high school and to the college scholarship opportunities she has received.

Carol Jean Rase. A high school English teacher from Fairview, Montana, Ms. Rase testified to her experiences and observations both as an athlete at the secondary and post-secondary level and as a high school basketball and volleyball coach at the Fairview Consolidated Schools.

George Bernard (Jack) Copps, Jr. Mr. Copps, Assistant Superintendent of Schools, Helena, Montana, testified to the role of extracurricular activities in education and to the efforts and costs expended by the Helena School District in attempt to reach compliance with the Settlement Agreement.

Patricia J. Price. Ms. Price is the Superintendent of Schools in Judith Gap, Montana, a town of approximately 200 in population. She testified to the nature of the academic and extracurricular programs at Judith Gap High School and to the involvement of the students and the townspeople in high school athletics.

Judith Ann Johnson. Ms. Johnson, Assistant Superintendent of the Montana Office of Public Instruction, testified to OPI's accreditation standards and to the role of OPI both in this litigation and in general enforcement or administration of equity in education.

Robin L. Selvig. Mr. Selvig, the women's basketball coach at the University of Montana, testified to his experiences and observations as both a high school coach in Plentywood, Montana, and a college coach at the University, as well as to his experiences as an athlete in Montana.

Michael L. Colbrese. Mr. Colbrese is the Assistant to the Executive Secretary of MHSA. He testified to his responsibilities as sex equity officer for MHSA and to MHSA's efforts to comply with the Settlement Agreement.

In addition, with the exception of Ms. Steele and Mr. Copps, each of the defendants' witnesses expressed an opinion, personal or professional, favoring the current seasonal placement of girls' volleyball and basketball.

Defendants also offered numerous written exhibits to augment the oral testimony. Chief among these were the results of two self-assessment surveys designed and administered jointly by MHSA and the Mountain West Educational Equity Centers to

---

**5.** Defendants have the burden of proof and the right to open and close.

measure the extent of the schools' compliance with the Settlement Agreement. Defendants also introduced the recorded results of a "follow-up" telephone survey conducted by Mike Colbrese and Dan Freund to inquire into areas of reported noncompliance. Additional exhibits included all defendants' plans of implementation and progress reports, together with supporting documentation, and the written report of Ms. Steele.

*Plaintiffs' Case in Chief*

Plaintiffs called as their first witness Percy A. Morehouse, Jr., Director of the Mountain West Educational Equity Centers at Weber State College, Ogden, Utah. Dr. Morehouse testified to his training, experience and observations in the areas of race and sex desegregation, and to the involvement of the Mountain West Center in the present litigation. Plaintiffs also called the following witnesses:

Cher King. Ms. King, the Associate Director of the Mountain West Educational Equity Centers, testified to the role of the Center in this litigation and to her experiences and observations in the sex equity field.

George Fred Rivera, Jr. Dr. Rivera, a faculty member of the University of Colorado at Boulder, testified to his role in quantifying and summarizing the data for the two self-assessment surveys conducted in the Montana high schools. He further testified to statistical methodology and factors which may influence reported data.

Julie Hoklin. Ms. Hoklin, the head volleyball coach at Laurel, Montana, testified to her experiences as a high school coach and as an athlete in Montana schools.

Earlene Davis. Ms. Davis, a parent and substitute teacher who also serves as chair of a sex equity subcommittee at Billings West High School, testified to her daughters' athletic experiences at Billings West and to her observations while a member of the subcommittee.

Linda Jean Posivio. Ms. Posivio, a substitute teacher and volleyball coach at St. Ignatius, Montana, testified to her experiences and observations as a high school volleyball coach and parent of two high school students.

Mark William Clark. A member of the University of Montana faculty, Dr. Clark testified to his experience in the field of "sport sociology" and to the possible impact of the seasonal placement on female high school athletes.

Deanna Paulus Larsen. Ms. Larsen, one of the original named plaintiffs in this action, testified to her athletic experiences at Columbia Falls High School and at Carroll College in Helena, Montana.

William J. Neville. The women's volleyball coach of Montana State University, Mr. Neville testified to the purpose and structure of the United States Volleyball Association and to college volleyball recruiting practices.

Barry Gomberg. Mr. Gomberg, the Court's expert witness in this matter, submitted a written memorandum at the Court's request which was marked and introduced as Court's Exhibit #1. By stipulation of the parties, Mr. Gomberg was allowed to be questioned and give testimony by telephone. Upon questions by plaintiff's counsel, he testified to his earlier role as Facilitator in this matter and to his "on-site" visits to Montana high schools.

Karyn Marie Ridgeway. The testimony of Ms. Ridgeway, one of the original named plaintiffs in this action, was submitted by deposition, taken in July, 1983. In her deposition, Ms. Ridgeway testified to her experiences and observations as a student athlete at Hellgate High School, Missoula, Montana, and to her involvement in this litigation.

Karen Brigetta Deden. Ms. Deden, a junior at Missoula's Sentinel High School, testified to her high school athletic experiences and observations.

In addition, with the exception of Dr. Rivera and Mr. Gomberg,[6] each of the

---

**6.** Mr. Gomberg stated that the "seasons issue" was such a close question it could, in his opin-

plaintiffs' witnesses expressed an opinion, personal or professional, favoring a change in the seasonal placement of girls' basketball and volleyball.

Plaintiffs introduced as documentary evidence the original survey booklets returned by a number of individual schools for both self-assessment surveys, to document specified areas of noncompliance with the Settlement Agreement. Plaintiffs' additional exhibits included several MHSA bulletins, the 1985–1986 Athletic Schedules published by MHSA, and letters sent to Karen Deden from college coaches and recruiters.

*Rebuttal*

On rebuttal, defendants recalled Judith Johnson, Mike Colbrese and Dan Freund, who gave further testimony as to the efforts expended by OPI and MHSA to reach compliance with the terms of the Settlement Agreement. In addition, Mr. Colbrese testified to the relative scholarship opportunities for girls and boys in Montana, and at the Court's request, defendants submitted evidence of the pecuniary costs of the schools' efforts to attain equity in athletics.

## FINDINGS OF FACT

Having considered and reviewed the evidence, briefs, arguments of counsel, and proposed findings and conclusions, and having disregarded any evidence which is inadmissible, and having assigned appropriate weight to the evidence received, the Court hereby finds the following facts: [7]

1. The Montana High School Association is a non-profit corporation made up of 185 public and private high schools within the State of Montana, ranging in size from 17 students to in excess of 2,000 students.

2. The high schools in Montana are divided into four (4) classes:

AA: 16 schools

A: 18 schools

B: 51 schools

C: 100 schools

3. The 16 class AA schools have the largest student populations, and the classes thereafter are increasingly smaller; 90 of the 100 class C schools have fewer than 100 students.

4. The purpose of MHSA is to promote high school activities and to provide a single entity to establish and enforce a uniform set of regulations to control contests between its member schools in the area of extracurricular activities. The activities promoted and regulated by the MHSA include music, athletics, drama, speech, and debate.

5. The MHSA is governed by a 5-member board of directors, an executive secretary, and the membership. Each member school has a designated representative in the Association, and MHSA regulations are passed by majority vote of the delegates at the annual meeting.

6. The Montana Office of Public Instruction is a state administrative agency charged with overseeing the educational needs of the public schools in the state of Montana.

7. One of the duties of the Superintendent of Public Instruction is to recommend standards of accreditation for all schools to the board of public education and to evaluate compliance with such standards.

8. Although OPI and MHSA are separate and distinct entities with separate and distinct purposes and functions, there are situations in which their responsibilities may overlap and in which members of the two entities will work jointly.

9. At the time this litigation was commenced, the condition existing in Montana was such that opportunities for girls to participate in high school athletics were grossly restricted compared to opportunities for boys. These inequities included, but were not necessarily limited to:

---

ion, be decided either way by the court.

**7.** These enumerated findings represent the final and complete findings of the Court. Any prior findings which either are inconsistent or not included herein are rejected.

a. Greater number of sports sanctioned by MHSA and offered by the schools for boys than for girls;

b. Disparities in length and continuity of athletic seasons, providing more advantageous seasons for boys;

c. Greater press coverage for boys' athletic events than for girls' athletic events;

d. Disparities in the number, quality, and salaries of coaches for boys' and girls' athletic programs;

e. More favorable team support for boys' athletic programs than for girls', particularly in the areas of cheerleader and band appearances, half-time performances, and booster clubs;

f. Disparities in the times and places for practices and events, providing boys' sports with more "prime time" practices and greater access to superior facilities;

g. Disparate treatment in the schools' recognition boards, halls of fame, or trophy cases;

h. Disparities in provision of meals, laundry facilities, per diem allowances and overnight trips;

i. Greater access for boys' teams to superior equipment, supplies, and uniforms;

j. Disparities in the quality of officiating at girls' and boys' athletic events.

10. Girls' volleyball was sanctioned by MHSA in January, 1983.

11. The Settlement Agreement entered into by and between the parties imposed the following requirements upon MHSA:

a. To sanction at least the same number of sports for females as for males;

b. To authorize athletic seasons of approximately the same length for the same sport played by both sexes, and seasons of length equal to the national norm for single-sex sports;

c. To provide athletic seasons in a manner to assure that the continuity of seasons for females and males shall be approximately equal;

d. To select tournament and statewide meet sites for both female and male sporting tournaments and events at loca-tions which are comparable considering the actual and reasonable needs of the tournament or statewide meet;

e. To issue press releases giving equal emphasis to male and female athletic events;

f. To seek to assure that equal opportunity in coaching for both female and male students is provided;

g. To assure that females and males participating in the same sport have equal opportunities to participate in summer camps offered for that sport;

h. To participate with school districts in improving recruitment opportunities for athletes playing a sport in a season outside the national norm for that sport;

i. To hire equally qualified officials for female and male sports during final tournaments;

j. To field complaints regarding compliance with the Settlement Agreement, and to thereafter investigate any such complaints and to take all steps reasonably necessary to assure compliance with the minimum requirements of the Agreement;

k. To distribute copies of the Settlement Agreement to its member schools;

l. To submit a plan for implementation of the Settlement Agreement and thereafter to submit a written progress report.

12. The Settlement Agreement entered into by and between the parties imposed the following requirements upon OPI:

a. To provide a vehicle for any aggrieved party to pursue a grievance pursuant to OPI's standard grievance procedure;

b. To provide to the school districts in Montana technical assistance in self-evaluation and self-improvement in providing sex equity in athletics, subject to the limitations of state and federal funding resources, in the following particulars:

(i) To respond to questions on issues of equity and to provide interpretations of state and federal law;

(ii) To distribute sex equity materials and handbooks and to keep school dis-

tricts apprised of developments in the law;

(iii) To provide various workshops intended to develop awareness of sex equity issues;

(iv) To continue its in-house committee on equity to assure that all publications are free from sex bias and are in compliance with the law;

(v) To continue other specified state level activities including workshops, training, and provision of handbooks on equity and self-evaluation;

(vi) To conduct certain activities at the national level, including hosting the 1984 National Conference on Equity, continuing to work with the Mountain West Desegregation Center, and keeping in contact with other state education agencies for information and materials pertaining to sex equity;

c. To distribute copies of the Settlement Agreement to any high school over which it has authority under Montana law;

d. To submit a plan for implementation of the Settlement Agreement and thereafter to submit a written progress report.

13. The Settlement Agreement entered into by and between the parties imposed the following requirements upon the local schools and school districts:

a. To offer the same number of sports for both males and females during the school year, except where an explicit and deliberate effort has been made to increase interest in an additional sport for the sex of students having fewer sports, and a survey has been conducted and establishes insufficient interest to field a team in a new sport. In that event, the school district is required to continue its efforts to equalize sports offerings until such offerings are equalized;

b. To seek, endeavor to hire, and where available to hire qualified coaches for male and female athletic teams and to hire comparable numbers of coaches based upon the number of participants; further, to develop and utilize criteria for hiring and evaluating coaches and to take appropriate measures where inadequate coaching is found;

c. To pay equal salaries for equal work by coaches of female and male teams, based upon gender-neutral criteria;

d. To issue press releases and arrange for advertising giving equal emphasis to male and female athletic events, and to further encourage comparable coverage of male and female sports;

e. To provide on an equal basis to male and female athletes team support, such as pep assemblies, school announcements, rosters, programs, pep band, cheerleaders and drill team performances;

f. To schedule the times and places for practices and athletic events for male and female teams of the same and comparable sports on an equal basis, providing equal access to "prime time" practice and use of equally desirable facilities;

g. To provide laundry services, if at all, to males and females on an equal basis;

h. To afford comparable recognition to female and male sports in the form of recognition boards, halls of fame or trophy cases;

i. To provide the same per diem monetary allowance for male and female athletes for meals, and comparable accommodations and opportunities for overnight trips;

j. To provide uniforms, accessories, equipment and supplies of comparable quality and at comparable replacement rates to females and males on an equal basis;

k. To affirmatively encourage booster or fan clubs to devote comparable attention to the promotion and encouragement of female and male sports, and to refrain from assistance of discriminatory organizations;

l. To provide transportation to male and female teams on an equal basis;

m. To provide the services of an athletic trainer, if any, on an equal basis to male and female athletes;

n. To hire the best available qualified officials for both female and male extra-curricular athletic events;

o. To participate with MHSA in improving recruitment opportunities for athletes playing a sport during a season which is outside the national norm for that sport;

p. To prepare a sex equity in athletics policy, to establish a grievance proce-·dure, to designate a coordinator for such policies and procedures, and to disseminate this information to the student body, faculty and parents;

q. To give notice to the class of the Settlement Agreement by dissemination to students and parents and by retaining copies of the Agreement for the use of students and parents within the district;

r. For those school districts named as defendants, to submit a plan for implementation of the Settlement Agreement and thereafter to submit a written progress report.

14. Between the time of execution of the Settlement Agreement and the time of the hearing, spanning a period of approximately two years, the MHSA has taken at least the following actions in an effort to comply with the terms of the Agreement:

a. At its annual meeting in 1984, MHSA reported to its membership regarding the Settlement Agreement, which had not yet been approved by the Court, and answered questions about the Agreement and its requirements;

b. Following adoption of the Settlement Agreement, MHSA distributed copies thereof to all school principals, city superintendents, board chairpersons, and athletic directors, and incorporated the text of the Settlement Agreement into the 1985–86 Official Handbook of the Montana High School Association;

c. MHSA has participated with OPI in a number of conferences or workshops directed toward sex equity in education, including both statewide workshops at the annual meetings of the Montana School Boards Association, the Association of Athletic Directors, and the School Administrators of Montana, as well as many area workshops for local administrators and coaches. MHSA also makes available a videotape of these workshops;

d. A delegate from MHSA attended the National Sex Equity Conference in 1984 to further acquaint the MHSA with the sex equity requirements and to inform the other attending educators of the *Ridgeway* Settlement Agreement;

e. Mike Colbrese, Assistant to the Executive Secretary, was designated, and is currently serving, as MHSA's sex equity officer, and has been responsible in this capacity for fielding questions on compliance with the Agreement, for disseminating equity information, for conducting sex equity workshops and visiting schools to educate faculty and administrators as to the requirements of the Agreement, for working in coordination with OPI as MHSA's "Equity Liaison", and for assisting in creating and implementing the two self-assessment surveys conducted within Montana. His duties as MHSA sex equity officer consume approximately 70% of his time;

f. MHSA has facilitated at least two meetings of school superintendents for the purpose of acquainting them with the requirements of the Settlement Agreement;

g. MHSA's rules pertaining to summer camps have been revised to afford equal summer opportunities to male and female athletes;

h. The Settlement Agreement has again been disseminated to all MHSA member schools and will remain a part of the MHSA handbook; as a result, any violation of the Agreement will be treated as a violation of a rule of the MHSA;

i. In conjunction with OPI and the Mountain West Educational Equity Centers, MHSA has distributed two Self-Assessment Surveys to its member schools, the first of which was analyzed and the data compiled and reported in November, 1985, and the second in March, 1986;

j. MHSA has implemented a rule requiring its member schools to utilize only

members of the Montana Officials Association to officiate volleyball matches;

k. MHSA has adopted the same teacher certification requirements for head volleyball coaches as are required for head coaches in the sports of football, basketball, track, and wrestling;

l. The MHSA Athletic Committee has been charged with encouraging women to become involved in coaching and in administration of athletic programs in Montana high schools;

m. A new rule has been adopted by MHSA, requiring officials' pools to allow officials who officiate football in the fall to also officiate girls' basketball;

n. MHSA has formed a media committee to encourage equal coverage of girls' and boys' athletic events and has attempted to provide equal treatment in all areas of publicity;

o. The beginning date of volleyball season has been rescheduled from January to the second week of December in attempt to equalize the continuity of seasons;

p. MHSA has forwarded correspondence to the NCAA and NAIA offices and to the athletic directors of each NCAA and NAIA member school, informing them of the placement of girls' basketball and volleyball in Montana, and of the dates and locations of all girls' basketball and volleyball tournaments;

q. MHSA has encouraged its member schools to implement scheduling of fall athletic events to avoid conflict between football and girls' basketball;

r. MHSA has encouraged its member schools to increase support of girls' athletics in the areas of scheduling and ticketing double-headers with boys' events, encouraging male cheerleaders, and establishing midseason "showcase" volleyball tournaments;

s. MHSA and OPI have established a sex equity advisory committee to review and comment upon interscholastic athletic activities and other MHSA functions to enhance the opportunity for girls to participate in all such activities;

t. Fast-pitch softball has been sanctioned by MHSA as a new girls' sport to be offered during the spring season. In conjunction therewith, MHSA has published information and offered films about softball, and will conduct rules clinics in 1986. However, during the 1986 spring sports season, only 13 of Montana's 185 high schools will actually offer softball;

u. MHSA has authorized athletic seasons of approximately equal length for both girls' and boys' sports where the sports are the same, and has made the length of single-sex sports seasons the same as that of the national norm;

v. MHSA has eliminated season overlap and has extended continuity of sports seasons to females and males of approximately equal length;

w. MHSA has made efforts to select comparable tournament and statewide meet sites for male and female athletic events, subject to the actual and reasonable needs of each tournament;

x. The MHSA Board of Directors has consistently waived the deadline of May 1 for schools requesting permission to participate in volleyball for the first time;

y. MHSA, in conjunction with OPI, has developed a summary of the Settlement Agreement for use by students;

z. MHSA has examined and reviewed coaching accreditation standards and is working with coaching associations and schools to prepare coaches for coaching athletes of both genders;

aa. MHSA has attempted to persuade the statewide news media to televise girls' state basketball tournaments, and plans to continue this effort until successful;

bb. MHSA plans to continue to issue self-assessment surveys to its member schools to gauge compliance with the Settlement Agreement;

cc. Following publication of the second self-assessment survey, MHSA officials Dan Freund and Mike Colbrese telephoned representatives of 150 schools that appeared out of compliance with the

Settlement Agreement in an effort to determine the reasons for the schools' noncompliance.

15. Between the time of execution of the Settlement Agreement and the time of hearing on this matter, the Office of Public Instruction has taken the following actions in an effort to comply with the terms of the Agreement:

a. Judith Johnson, Assistant Superintendent of OPI, was designated, and continues to serve, as state Title IX coordinator to provide technical assistance in accordance with the provisions of the Settlement Agreement; she also acts as OPI's liaison with MHSA;

b. OPI has disseminated approximately 1,000 copies of both the Settlement Agreement and the Rules for All School Controversy Contested Cases before the State Superintendent and County Superintendents of Schools, to all district superintendents, county superintendents, school libraries, the Montana Association of County Attorneys, and all major educational organizations in the State of Montana;

c. OPI staff and legal counsel have participated with MHSA in coordinating and presenting training sessions and conferences across the state regarding the Settlement Agreement and equity issues in general. The Legal Services Department of OPI has additionally made numerous legal presentations to organizations, schools and colleges throughout Montana;

d. OPI has developed a handbook for school administrators entitled "Equity in Education", which is a comprehensive guide and checklist to assist schools in providing equitable treatment to students in all phases of education;

e. Training sessions have been conducted, and materials distributed, concerning OPI grievance procedures, involving school boards, school administrators, and county attorneys;

f. OPI, in conjunction with MHSA, developed a sample equity policy statement and a sample grievance procedure for use in the public schools, and distributed these items to school officials across the state. The suggested model provides a comprehensive grievance procedure commencing with informal discussions with the school principal and proceeding all the way to a formal contested case procedure before the State Superintendent.

g. OPI presented and sponsored the National Equity Conference in Kalispell, Montana, in June, 1984;

h. Staff members of OPI have monitored the activities of the Montana Human Rights Commission in the area of educational equity and have attended all Commission meetings regarding sex equity and interscholastic athletics in public schools in Montana. OPI staff members have presented material and information to the Human Rights Commission in this area and have worked jointly with Commission staff in coordinating presentations on education and equity.

i. A resources and film list on equity issues has been compiled by OPI staff and distributed to school districts, indicating materials available through OPI for use of the schools;

j. OPI staff members drafted and presented a proposed equity policy for adoption by the Montana Board of Public Education, which has been adopted as state policy and codified in § 10.55.109 of the Administrative Rules of Montana;

k. The equity policy proposed by OPI was adopted as a new accreditation standard prohibiting discrimination in all areas of education. This standard will take effect in July, 1986; as such, it will be investigated and enforced by OPI in the same manner as all other accreditation standards;

l. OPI has prepared and distributed "Equity Appraisal Forms" to be used in conjunction with accreditation reviews;

m. Together with MHSA, OPI staff members have prepared a 14-page summary of the Settlement Agreement for use by students, parents and school officials in an "easy-to-read" format;

n. A State Equity Advisory Council has been created for the purposes of reviewing and commenting upon the state of interscholastic athletics for high school girls, to work with OPI and MHSA to enhance opportunities for females, and to promote and encourage involvement of women at all ages in athletic programs;

o. OPI staff and legal counsel continue to incorporate sex equity discussions into seminars and presentations in all areas of education;

16. The Mountain West Educational Equity Center released the report of the Second Self-Assessment Survey in March, 1986. The survey results represent the reports from 175 of Montana's 185 high schools on the status of their athletic programs and projections for the remainder of the 1985–86 school year.

17. The present condition of the athletic programs in Montana's high schools is as follows:

a. While the majority of schools now offer the same number of sports for boys and girls, there remain a significant number which continue to offer more boys' programs;

b. The numbers of girls participating in high school athletics has increased since the time of the Settlement Agreement; however, the survey results show that during any given season one-half or more of the female students in high school do not participate in athletics;

c. Substantial progress has been made in the continuity and length of sports seasons, and the figures regarding numbers of practices and events and days of season are relatively equally balanced;

d. More than one-half of the high schools in Montana do not have written criteria for hiring coaches; however, nearly three-quarters have written evaluation criteria;

e. A substantial number of schools still pay coaches of girls' sports less than coaches of boys' sports although most seem to have adopted gender-neutral factors on which to base salaries;

f. A majority of schools have taken no affirmative steps to increase publicity for girls' athletic events or to increase recruiting of female athletes;

g. A substantial number of schools have not reached equity in the areas of team support such as cheerleaders, band appearances and half-time performances;

h. The school districts in Montana are providing coaches with comparable qualifications and in comparable numbers to boys' and girls' athletic programs;

i. A majority of schools continue to provide more prime time access and use of facilities to boys' athletic practices and events than to girls' practices and events;

j. Where athletic trainers are provided, schools are providing their services equally to boys and girls;

k. Most schools are in compliance with the requirements of having a written equity in athletics policy, a written grievance procedure, and an identified Title IX coordinator;

l. The survey results indicate that there may be sufficient interest in a number of schools for addition of a new girls' sport.

m. School districts in Montana generally are providing uniforms, accessories, equipment, and supplies to boys and girls on an equal basis.

18. Neither MHSA nor OPI has yet begun to enforce activity the terms of the Settlement Agreement or the new accreditation standard.

19. Extracurricular activities play a significant role in the overall educational process at the high school level; interscholastic athletics programs may provide opportunities for development of skills in leadership, cooperation, and discipline, as well as enhancement of physical skills.

20. There are certain advantages to the current seasonal placement of girls' basketball in the fall and girls' volleyball in the winter. These include:

a. Girls' basketball programs, which are very strong in Montana, enjoy a favorable situation of having their "own" season, and are able to draw substantial fan support and revenue, particularly in

small towns where girls' basketball is the only fall sport;

b. Many schools with limited resources for faculty and staff use the same coaches for the girls' and boys' basketball programs;

c. In many areas of Montana, qualified officials are in short number, and the current seasonal alignment allows these individuals to officiate both girls' and boys' basketball;

d. Opportunities are greater for younger children in the junior high school and junior varsity levels to participate in athletic programs because of the greater availability of coaching and facilities;

e. Because the girls' seasons are outside the national norm, college recruiters are able to come to Montana to personally observe the girls play during a time when the college teams are not busy with their own seasons;

f. Many student athletes, parents and school supporters favor the current seasonal placement because it offers a wider opportunity for athlete and fan participation;

g. Many of the small high schools in Montana offer only basketball and track for both boys and girls; the current alignment of the seasons allows optimum usage of these schools' limited facilities and provides the townspeople with an athletic event to support during every season;

h. Female athletes in eastern Montana have the opportunity to schedule competitions with athletic teams in North and South Dakota, as those states have a seasonal alignment identical to Montana's.

21. There are certain disadvantages to the current seasonal placement of girls' basketball in the fall and girls' volleyball in the winter. These include:

a. Volleyball players in Montana do not have the opportunity to compete in tournaments and contests sponsored by the AAU and the United States Volleyball Association (USVBA), because these competitions are normally scheduled during the Montana volleyball season;

b. Female athletes in Montana may be restricted in their opportunities to compete in athletic contests with teams from other states in which the seasons conform to the national norm;

c. Montana volleyball players do not have the opportunity to be chosen for any All-American teams, as such teams are chosen prior to the close of Montana's volleyball season;

d. Female athletes in Montana, particularly volleyball players, may be at a disadvantage for recruiting opportunities for the reason that the national "letter of intent" date falls in the middle of the Montana volleyball season;

e. Female athletes who transfer to Montana schools from outside the state may ' encounter problems with MHSA transfer rules because of the seasonal placement;

f. Female athletes in Montana may not experience comparable psychological benefits from their participation in athletics as do their male counterparts because of their awareness that they are playing outside the national norm; however, there is insubstantial evidence to demonstrate the actual existence of any psychological detriment being suffered by Montana high school girls;

g. Because volleyball has been sanctioned by MHSA only since January, 1983, and is thus a relative "newcomer" to the athletic programs of Montana high schools, it does not yet receive the fan support enjoyed by other programs and therefore tends to be given less favorable treatment by school administrators, coaches, faculty, and students, quite often taking a "back seat" to boys' basketball. This occurrence would not likely be as frequent were volleyball played in the fall.

22. On balance, there is a relative advantage in favor of girls' basketball in the fall, and a relative disadvantage against girls' volleyball in the winter. Overall, the

seasons placement is not necessarily disadvantageous to girls.

23. Documents prepared by MHSA and OPI demonstrate that more than $3,000,-000.00 has been spent in the past two years in the defendants' efforts to reach compliance with the Settlement Agreement; however, these exhibits are not clear as to what amounts would have been required for salaries, equipment, uniforms, and other costs even without the mandates of the Settlement Agreement.

24. The Settlement Agreement reached by the parties in this case, and programs implemented as a consequence thereof, represent a model program for the region and have been used as an example by the Mountain West Educational Equity Center.

25. A substantial change has occurred in Montana's high school athletics programs since the commencement of this action, resulting in increased opportunities for female high school athletes and a much greater awareness of equity issues at all levels of educational administration.

## ANALYSIS AND CONCLUSIONS

██ As the issue has been framed by the parties, the Court is to decide if opportunities to participate in athletics are being provided to high school boys and girls on an equal basis and, if not, whether a change in girls' basketball and volleyball seasons must be implemented. The law is clear, and the parties agree, that there is no constitutional requirement that schools provide students with extracurricular activities.[8] It is equally clear, however, that where the school chooses to provide such activities, they must be provided to all students on an equal basis. *See, Brown v. Board of Education, supra.*, 347 U.S. at 493, 74 S.Ct. at 691.[9]

Because of the nature of plaintiffs' complaint, the Court will undertake a twofold analysis. Plaintiffs' federal constitutional claims will be separately considered first, and the claims arising under Title IX and Montana law, which the Court believes provide similarly stringent standards of equity, will be jointly analyzed thereafter.

### Equal Protection

Classifications that distinguish between males and females are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). "To withstand constitutional challenge, ... classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

Many courts have had occasion to apply an equal protection analysis to issues of sex discrimination in high school athletics, but few, if any, under analogous circumstances. The vast majority of cases in this area relate to provision of particular sports for girls or boys. One of the earliest such cases, applying strictly an equal protection analysis, held that the defendant school districts were required to allow girls to participate on the boys' teams in the non-contact sports of tennis and cross-country skiing and running. *Brenden v. Independent School Dist. 742,* 477 F.2d 1292 (8th Cir.1973). The court stated that the equal protection clause requires consideration of three factors:

(1) the character of the classification in question;

(2) the individual interests affected by the classification in question; and

(3) the governmental interests asserted in support of the classification.

The Court concluded that the plaintiffs' interests in participating in interscholastic

---

8. *See generally, Hoover v. Meiklejohn,* 430 F.Supp. 164 (D.Colo.1977); *Brenden v. Independent Sch. Dist., 742,* 477 F.2d 1292, 1297 (8th Cir.1973); *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

9. I equate MHSA and OPI with the State of Montana for purposes of determining state action in resolving these constitutional issues. *See Brenden v. Independent Sch. Dist.,* 477 F.2d 1292, 1295 (8th Cir.1973).

athletics outweighed the defendants' purported interests in assuring that persons with similar qualifications compete among themselves. *Id.*, at 1300.

In a similar case, a federal district court held that where a high school offers interscholastic soccer for boys, complete denial of any opportunity for girls to play interscholastic soccer is a violation of the female students' right to equal protection. *Hoover v. Meiklejohn*, 430 F.Supp. 164 (D.Colo.1977). The court held that defendants were faced with a choice: to discontinue soccer as an interscholastic activity; to field separate teams for males and females, with substantial equality in funding, coaching, officiating and opportunity to play; or to permit both sexes to compete on the same team.

> The courts do not have competence to determine what games are appropriate for the schools or which, if any, teams should be separated by sex. What the courts can and must do is to insure that those who do make those decisions act with an awareness of what the Constitution does and does not require of them. Accordingly, it must be made clear that there is no constitutional requirement for the schools to provide any athletic program, as it is clear that there is no constitutional requirement to provide any public education. What is required is that whatever opportunity is made available be open to all on equal terms.

*Id.*, at 171.[10]

Other courts have considered a sex discrimination issue more closely related to the "seasons" issue in this case. There is a handful of states in the union in which the rules by which girls' basketball is played differ from the rules by which boys play basketball and from the rules used in the national norm. The rules for the girls' teams in these states provide for half-court restrictions, six players instead of five, and permit only forwards to shoot the ball; the forwards may play only in the team's offensive end of the court and the guards only in the defensive end.

Several equal protection challenges to these rules have been raised in federal courts, and the results have been split. The decisions range from a holding that the rules are clearly based upon differences in physical characteristics and capabilities between the sexes,[11] to a holding that "[s]imply doing things the way they've always been done is not an 'important governmental objective.' "[12]

A better-reasoned decision is *Jones v. Oklahoma Secondary Sch. Activities Association*, 453 F.Supp. 150 (W.D.Okla. 1977), in which the court held that *Brown v. Board of Education, supra.* "cannot and must not be stretched to such lengths as to require *every* program, *every* rule, *every* facility and *every* policy in *every* school to be the same." *Id.*, at 154 (emphasis in original). The court stated that plaintiff's allegations of reduced opportunity to compete in amateur, professional and olympic basketball, and reduced opportunity for a college scholarship, did not rise to the level of a constitutional violation.

> The present rules of which plaintiff complains may well be out of step with other states' rules and may not be in the best interest of the high school girls who play basketball in Oklahoma. However, absent a substantial deprivation of a constitutional right, such a policy decision is

**10.** For additional cases regarding participation in particular sports, *see, Darrin v. Gould,* 85 Wash.2d 859, 540 P.2d 882 (1975); *Yellow Springs Exempted Village Sch. Dist. Bd. of Ed. v. Ohio High School Athletic Association,* 647 F.2d 651 (6th Cir.1981); *Lantz by Lantz v. Ambach,* 620 F.Supp. 663 (S.D.N.Y.1985); *Gomes v. Rhode Island Interscholastic League,* 469 F.Supp. 659 (D.R.I.1979), *vacated as moot,* 604 F.2d 733 (1st Cir.1979); *cf., Clark v. Arizona Interscholastic Ass'n,* 695 F.2d 1126 (9th Cir.1982) (school not required to allow boys' participation on

girls' volleyball team); and *O'Connor v. Board of Education of Sch. Dist. 23,* 545 F.Supp. 376 (N.D.Ill.1982) (gifted female basketball player has no right to play on boys' team where girls' team is provided).

**11.** *Cape v. Tennessee Secondary Sch. Athletic Assn.,* 563 F.2d 793 (6th Cir.1977)

**12.** *Dodson v. Arkansas Activities Assn.,* 468 F.Supp. 394 (E.D.Ark.1979)

best left to the judgment of those who play, coach, and administer interscholastic basketball, and not the federal court. *Id.,* at 156.

Plaintiffs earlier argued that requiring girls to play interscholastic basketball and volleyball in seasons outside the national norm denies these individuals equal treatment under the law in violation of the Fourteenth Amendment.[13] Plaintiffs now argue that, under the facts of this case, the seasonal placement constitutes a deprivation of equal protection of the laws. I cannot agree. Whether considered in a vacuum or under the facts here involved, I hold that plaintiffs have not been deprived of any constitutional right by placement of the seasons.

■ Applying the standard equal protection analysis, the governmental objective sought to be served by the MHSA is in dividing the seasonal placement of sports in a manner which will maximize student participation, availability of coaching staff, availability of officials, availability of facilities, and team support. Given the importance of extracurricular activities to the development of the child and the special emphasis placed on high school athletics in Montana, this is an important objective.

■ The placement of girls' basketball in the fall and girls' volleyball in the winter substantially contributes to the availability of coaches, officials and facilities. The seasonal alignment further contributes to student participation in the smaller high schools which do not offer football or volleyball, because it allows the students to participate as athletes during the season in which their sport is offered and as cheerleaders, band members or half-time performers during the season in which their sport is not offered. Recognizing the ever-present budgetary constraints imposed upon Montana school districts, it is the Court's conclusion that the seasonal alignment is substantially related to the achievement of MHSA's objectives. This holding is consistent with the ruling of the Ninth Circuit Court of Appeals in *Clark v. Arizona Interscholastic Assn., supra.:*

> In this case, the alternative chosen may not maximize equality, and may represent trade-offs between equality and practicality. But since absolute necessity is not the standard, and absolute equality of opportunity in every sport is not the mandate, even the existence of wiser alternatives than the one chosen does not serve to invalidate the policy here since it is substantially related to the goal. That is all the standard demands .... While equality in specific sports is a worthwhile ideal, it should not be purchased at the expense of ultimate equality of opportunity to participate in sports. As common sense would advise against this, neither does the Constitution demand it.

*Clark, supra.,* 695 F.2d at 1131–1132.[14]

*Montana Law and Title IX*

■ Under Title IX and the Montana Constitution, the Court must apply a more stringent standard and must consider a different issue. Article X, Section 1(1), of the Montana Constitution, provides:

> It is the goal of the people to establish a system of education which will develop the full educational potential of each person. Equality of educational opportunity is guaranteed to each person of the state.

The State Constitution also expressly prohibits discrimination by the state or by private individuals on the basis of sex. Mont. Const. art. II, § 4.

Similarly, Title IX of the Education Amendments of 1972 focuses on equality of opportunity in education for members of

---

13. By adopting the Facilitator's findings and establishing this review procedure, the Court ruled that the seasonal placement, in and of itself, was not discriminatory *per se.* Plaintiffs concede that, having acquiesced in this ruling, it has become the law of the case, precluding the issue from being further raised.

14. *See also, Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979): "The Fourteenth Amendment guarantees equal laws, not equal results."

both sexes. 20 U.S.C. § 1681. The regulations promulgated under Title IX provide specific non-exclusive factors to be considered in determining whether equal opportunities are available:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

*See,* 45 C.F.R. § 86.41, 34 C.F.R. § 106.41, 10 C.F.R. § 1040.44. The factors outlined in these federal regulations are quite similar to the criteria suggested by the Facilitator in his December, 1984, report to the Court, and provide a good measuring device by which to determine equality of opportunity.

It is clear from the language of the Title IX regulations that the point at which provision of equal opportunity is achieved is dynamic; it turns on the interests and abilities of the affected students at any given time. The goal of equity is by its nature ever-changing, just as the interests and abilities of the state's children are ever-changing. It is therefore unquestionable that to reach equity, and to guarantee the constant provision of equal opportunity to all students, school districts must develop an accurate means by which to measure the students' interests and abilities, and must conduct such a measuring process on a regular basis.

I conclude that as a result of the efforts of MHSA and OPI, prompted by the initi-

ation of this litigation, school districts in Montana have made commendable progress toward achieving equitable provision of athletic opportunities for all students, male and female. It is unfortunate that the wheels were not set in motion until more than a decade after the enactment of Title IX and the ratification of the state constitution. However, largely to the credit of a number of dedicated individuals, the school administrators of Montana have become aware of the term "equity" and what it requires. Montana is well on its way to becoming a model example of equity in education.

■ It is also my conclusion, however, that equity in the secondary athletic program is yet unrealized, particularly in the areas of access to prime practice time, access to equally desirable facilities, team support, provision of junior varsity and younger level teams for girls' sports, and sports offerings. Of paramount concern is the need for more precise and uniform measurement of girls' interests in athletics, and accommodation of these interests. The figures show that many girls still are not participating in high school sports and that there may in fact be sufficient interest on the part of those students to get involved in sports which are not offered. It is this area in which the schools should take special interest.

I recognize that a contributing factor to the remaining disparities is the slow and often painstaking process of attitudinal change. This factor too has seen much progress over the past several years, and with the steady encouragement of state and MHSA officials, will continue to advance.

■ Finally, given the Court's ruling that equity has not been achieved, the issue remains as to whether a seasons change is necessary. I conclude that most areas in which equity has not been achieved are irrelevant to the seasonal placement of girls' basketball and volleyball. An order by this Court merely requiring reversal of the seasons in which those activities are

offered will do nothing to remedy the inequities the Court has found to exist. The Court seeks to provide the remedy which will best serve the goal of maximizing participation in athletics by the most students. The leadership of MHSA has determined that a change in seasonal placement will not facilitate this goal. At this time and under these circumstances, it is not for this federal court to overturn that state decision.

The Court is of the opinion that opportunities for Montana's female high school students to participate in athletics and to enjoy the benefits thereof on an equal basis with male high school students, will best be served by the continuing efforts of MHSA, OPI, and particularly local school administrators to survey and accommodate the interests and abilities of the female students.

I intend to retain jurisdiction over this action and to appoint a Special Master, pursuant to Rule 53, Fed.R.Civ.P. It will be the responsibility of the Master to conduct a thorough investigation of the athletic programs in Montana's high schools during the 1986–87 school year and to submit a report to the Court on the status of equal opportunity by the summer of 1987. The Court will not relinquish its jurisdiction over this litigation until such time as an acceptable measure of equality has been achieved.

## ORDER

IT IS ORDERED:

1. The girls' high school basketball program in Montana shall remain in the fall and the high school volleyball program shall remain in the winter for the 1986–87 school year.

2. The Montana High School Association and the Montana Office of Public Instruction shall continue their efforts to achieve full equality in high school sports in Montana.

3. The parties may, within 30 days hereof, submit nominations to the Court for designation of a Special Master to be appointed prior to the commencement of the 1986–87 school year.

4. The Court will entertain motions for release of any original exhibits or materials within ten (10) days of this order.

5. Costs of the hearing procedure to this date shall be borne by MHSA and OPI, to be apportioned by agreement between them. In the event MHSA and OPI are unable to agree on the manner in which the costs are to be divided, the Court will consider an appropriate motion within thirty (30) days hereof.