Karyn RIDGEWAY, et al.,
Plaintiffs–Appellants,

v.

MONTANA HIGH SCHOOL
ASSOCIATION, et al.,
Defendants–Appellees.

No. 86–3901.

United States Court of Appeals,
Ninth Circuit.

Argued Oct. 6, 1987.

Submitted Oct. 23, 1987.

Decided Oct. 4, 1988.

Susan M. Rogers, Little Rock, Ark., for plaintiffs-appellants.

Ronald F. Waterman, Helena, Mont., for defendants-appellees.

Before TANG, SCHROEDER and BEEZER, Circuit Judges.

SCHROEDER, Circuit Judge:

## INTRODUCTION

The plaintiffs in this class action are girls attending public high schools in the State of Montana and the girls' parents. Plaintiffs brought this action against the Montana High School Association and various school districts for the purpose of challenging a wide range of practices in Montana high school athletic programs that plaintiffs maintain have unlawfully discriminated against female students in favor of males. They sought equitable relief for conditions which they alleged violated both federal law and provisions of the Montana State Constitution. The case in its early stages was before District Judge Ray McNichols, and after his death, before District Judge Charles Lovell.

With the encouragement of both judges, the parties pursued a creative settlement course in which they utilized the services of a professional "facilitator." The facilitator was chosen for his expertise in the area of

improving equality of opportunities for males and females in school athletic programs.

As a result of the settlement course, the parties were able to effectuate many changes in the programs of the high schools without the active intervention of the district court. In accordance with the Settlement Agreement and the recommendation of the facilitator, the matter eventually came back before Judge Lovell to determine a key issue: whether or not the high schools should be required to change the seasons in which the girls played varsity volleyball and basketball so that those seasons would coincide with the conventional seasons in the rest of the country.

The district court held an evidentiary hearing and determined that although the schools had made significant strides toward improving the opportunities for girls' participation in athletics, equality was not yet achieved. It declined to require an immediate season shift because it found that such a switch would not bring about significant improvements in opportunities for the girls, and was not directly related to the remaining serious problems of inequality. The court did, however, maintain jurisdiction of the case, and appointed a special master to oversee the implementation of the parties' Settlement Agreement attempting to achieve equality. *Ridgeway v. Montana High Sch. Ass'n*, 633 F.Supp. 1564, 1582–83 (D.Mont.1986).

The plaintiffs appeal from the district court's order, and contend that the district court should have ordered an immediate change for the two girls' sports. The order they appeal is in the nature of an order denying injunctive relief. We therefore have jurisdiction pursuant to 28 U.S.C. § 1291, which authorizes appeals from the granting or denial of injunctive relief.

We affirm the district court because we believe the district court appropriately resolved the issues which it was asked to resolve in the unique context of the parties' Settlement Agreement. That agreement authorized the district court to examine the season question in the light of all of the conditions existing in the Montana high schools with respect to athletics, and to make an essentially factual determination as to whether immediate implementation of that change would materially further the agreement's objective to bring the girls' athletics program up to the level of the boys'.

## BACKGROUND

The complaint in this case is a reflection of concerns voiced in many quarters over the last several decades that young women are being unfairly discriminated against in athletic programs at educational institutions. In 1972, Congress passed Title IX of the Education Amendments of 1972 with the intent of eliminating sex discrimination in education. Its scope included athletic programs. 45 C.F.R. § 8641(a).

By 1980, a survey by the United States Commission on Civil Rights concluded that while progress had been made, old ideas die hard. It traced attitudes toward athletics from the Victorian Era, when women were considered too weak and frail to participate, through more modern notions that sports are masculine activities. It concluded that the low participation rate by women was more a reflection of lack of opportunity rather than lack of interest. U.S. Commission on Civil Rights, *More Hurdles to Clear* 1–6 (1980). Reprinted as an appendix to *Yellow Springs Exempted Village Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651 (6th Cir.1981) (separate opinion of Judge Jones).

That study and others have documented continuing inequities in the variety and number of athletic opportunities at educational institutions. For example, boys' high school athletic programs received five times more money than girls' in 1974; men's college athletic programs received 30 times more money than women's. *More Hurdles to Clear* at 6. Although by 1980 the disparity was not as great, male athletic programs continued to receive more funding. *Id.* In 1982, 71% of colleges continued to offer fewer sports for women than for men, and gave women only one-sixth of all athletic funding, although women numbered one-third of all intercollegiate

athletes. Tokarz, *Separate but Unequal Educational Sports Programs*, 1 Berkeley Women's L.J. 201, 230 (1985). Disparity between female and male athletic programs has prompted much scholarly attention. *See, e.g.*, H. Appenzeller & T. Appenzeller, *Sports and the Courts* (1980); DeCrow, *Hardlining Title IX*, 12 Civ.Rights Q. 16 (1980); Martin, *Title IX and Intercollegiate Athletics*, 8 Ohio N.L.Rev. 481 (1981); Fabri & Fox, *The Female High School Athlete and Interscholastic Sports*, 4 J.L. & Educ. 285 (1975).

Specific issues which have reached the courts include whether females can be excluded from a school's only team in a given sport, *see, e.g., Carnes v. Tennessee Secondary Sch. Athletic Ass'n*, 415 F.Supp. 569, 572 (E.D.Tenn.1976); whether males may be kept off female athletic teams when no male team is available, *see, e.g., Clark v. Arizona Interscholastic Ass'n.*, 695 F.2d 1126, 1129 (9th Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed. 2d 90 (1983) and *Petrie v. Illinois High Sch. Ass'n*, 75 Ill.App.3d 980, 31 Ill.Dec. 653, 394 N.E.2d 855, 862 (1979); whether half-court basketball rules for girls are constitutional, *see, e.g., Dodson v. Arkansas Activities Ass'n*, 468 F.Supp. 394, 397 (E.D. Ark.1979); whether rules placing girls' teams in out-of-norm seasons meet a separate but equal standard, *see, e.g., Michigan Dept. of Civil Rights v. Waterford Township Dept. of Parks & Recreation*, 124 Mich.App. 314, 335 N.W.2d 204, 208 (1983), *reversed*, 425 Mich. 173, 387 N.W.2d 821, 833–34 (1986) and *Striebel v. Minnesota State High Sch. League*, 321 N.W.2d 400, 402 (Minn.1982). The scope of this case encompassed these areas and more.

The plaintiffs filed this complaint on May 11, 1982. The named plaintiffs in June of 1983 were certified as representing all female students who attend or will attend three public high schools attended by the three named plaintiffs. The defendants are the Montana High School Association (MHSA), an Association of high schools that regulates interscholastic athletics among member schools, the Montana Office of Public Instruction (OPI), and the three high school districts.

The complaint alleged violation of the plaintiffs' rights guaranteed by the Equal Protection Clause of the fourteenth amendment of the United States Constitution, Title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681 *et seq.*) and by the Constitution and laws of the State of Montana. Plaintiffs asked for injunctive relief and damages. The specific factual allegations included the following:

(1) 88 percent of Montana High Schools provided sports for boys fall, winter and spring, but only 16 percent provided them for girls during all three seasons;

(2) fewer girls participated in interscholastic high school sports;

(3) every high school in the state spent more money on boys' sports than on girls' sports;

(4) Montana was one of two states which had failed to approve power volleyball as an interscholastic sport despite three requests in three years;

(5) only seven interscholastic sports were available to girls, while eleven interscholastic sports were available to boys;

(6) girls' basketball and volleyball in Montana were played in out-of-norm seasons;

(7) practice schedules for girls' sports teams were scheduled at undesirable times so as not to interfere with the practice schedules of boys' teams;

(8) MHSA publicized boys' tournaments more than girls' tournaments;

(9) all four classes of boys' basketball had All Star Teams, but All Star Teams were not available for girls' basketball; and

(10) the defendant school districts discriminated against girls in the scheduling of sport events, coaching, uniforms, use of school band, pep rallies, locker room facilities, access to trainers, and transportation.

The defendants initially resisted plaintiffs' claims on jurisdictional grounds, but their efforts were largely unavailing. Judge McNichols in 1983 entered an order

finding class certification appropriate pursuant to Rule 23, Fed.R.Civ.P. and limiting remedies of the class to declaratory and injunctive relief. In the subsequent Settlement Agreement, the scope of the case was expanded to all school districts within Montana with the agreement of the high school association and OPI. The course of the suit is detailed in the district court's opinion, *Ridgeway v. Montana High Sch. Ass'n*, 633 F.Supp. 1564 (D.Mont.1986).

The parties in this case turned to constructive settlement negotiations in a joint effort to bring about improvements in the high school athletic opportunities for girls statewide. They appointed a "facilitator" to assist them in their efforts. The facilitator was Barry Gomberg of the Mountain West Sex Desegregation Assistance Center of Weber State College in Ogden, Utah. With the assistance of the facilitator, the parties worked out a detailed Settlement Agreement. The purpose of the agreement was set forth as follows:

> to advance the opportunities which female high school students have to participate in extracurricular athletic events relative to their male counterparts; to create, implement and enforce minimum requirements for obtaining sex equity in athletics in Montana; and to make available established grievance procedures ... to permit students experiencing sex inequities to obtain non-judicial relief, while retaining the availability of alternative redress through remedies extended by state and federal law.

The Settlement Agreement had three principal components. First, the parties agreed on minimum statewide requirements in school athletic programs and compliance measures; the defendants agreed to prepare a plan for implementation incorporating the agreement's minimum requirements and to submit the plan to the facilitator for review and comment. Second, the parties agreed that the principal issue about which they could not agree was related to the basketball and volleyball seasons for girls. The parties agreed that the facilitator should conduct research concerning that issue. Third, the defendants agreed to submit a compliance report to the court three months after the Settlement Agreement concerning the changes made in order to comply with the agreement. The first two items of these components deserve some amplification.

The statewide minimum requirements on which the parties agreed were the following:

(1) MHSA must sanction the same number of sports for girls as for boys. After the 1985–86 school year, MHSA must select all further sports to be sanctioned by surveying the interests and abilities of both boys and girls. In addition, the playing seasons for future sanctioned sports must be determined by the national norm and gender-neutral factors. Although sanctioned sports need not be co-ed, single sex sports must be chosen by gender-neutral factors. In addition, school districts must schedule the same number of games for both boys and girls' teams, provide the same number of practice days and provide equal season lengths. Sports played by only one sex or the other must have seasons equal to the national norm for those sports.

(2) MHSA and the school districts must provide athletic seasons that assure continuity of seasons for both girls and boys. In addition, sports seasons must not overlap preventing interested students from participating in consecutive athletic seasons.

(3) MHSA must schedule tournament and meet sites for both girls' and boys' tournaments at comparable locations, and must determine those locations based on gender-neutral factors.

(4) MHSA press releases must give equal emphasis to boys' and girls' athletic contests and must equalize other publicity.

(5) MHSA must assure equal opportunity in the selection of coaches for both boys' and girls' teams.

(6) MHSA must assure that both girls and boys competing in the same sport have equal opportunities to participate in summer camps offered for that sport.

(7) MHSA must improve recruitment opportunities for athletes playing in sports out of the normal playing season.

(8) MHSA must hire equally qualified officials for both girls' and boys' sports during final tournaments. In addition, MHSA must set rates for those officiating female volleyball at not-less-than the same rate paid to volleyball officials nationally.

In addition to statewide minimum requirements, the Settlement Agreement delineated minimum requirements for Montana school districts, to be met by the 1985–86 school year:

(1) School districts must offer the same number of sports for girls and boys and must choose those sports based upon the students' interests and abilities. A school district need not offer the same number of sports if it has conducted a survey and made an effort to increase interest in an additional sport, but has found insufficient interest. If the survey shows sufficient interest for a new sport, the school district must offer that sport if it is able, considering equitable division of limited funds. However, limited funds is not a justification for offering an unequal number of sports.

(2) School districts must hire comparable and qualified coaches for both boys' and girls' athletic teams, and must hire comparable numbers of coaches based on the number of participants in those teams. The districts must develop written, objective and gender-neutral criteria to evaluate coaching applicants and to evaluate the performance of all coaches. The Settlement Agreement enumerates factors to be taken into account. In addition, the Settlement Agreement delineates the procedure to be followed in evaluating head coaches, and in aiding or terminating inadequate female head coaches.

(3) School districts must pay equal salaries for equal work by coaches of girls' and boys' teams with the exception of salaries determined under a seniority system, merit system, or other system measuring performance. School districts must develop and utilize written, objective criteria for such systems.

(4) School districts must encourage comparable media coverage, and give equal emphasis in its own press releases to both boys' and girls' sports. The Settlement Agreement enumerates factors in determining whether a school district has made a good faith effort to equalize publicity. School districts must provide on an equal basis to both boys' and girls' teams pep assemblies, school announcements, rosters, programs, pep band, cheerleader and drill team support.

(5) School districts must schedule times and places for practices and games for all teams on a comparable basis. Boys and girls teams must have equal access to prime time play, including the hours immediately after school for practices and the weekend evenings for regular games. School districts must also make reasonable efforts to schedule boys' and girls' games together for similar sports. Finally, school districts must provide on a comparable basis support facilities including training rooms, weight rooms, locker rooms, storage facilities and laundry services. If they provide athletic trainers, they must provide the services of the trainers to boys' and girls' teams on an equal basis.

(6) School districts must provide comparable recognition to girls' and boys' sports in the form of recognition boards, halls of fame or other displays.

(7) School districts must provide the same amount of per diem monetary allowance for male and female student athletes. In addition, school districts must provide comparable over-night accommodations and comparable opportunities for overnight and out-of-state athletic trips. Finally, school districts must provide transportation to athletic events on an equal basis for both boys and girls teams, with allowances made for gender-neutral factors enumerated in the agreement.

(8) School districts must provide uniforms, accessories, equipment and supplies of comparable quality and at comparable replacement rates to boys' and girls' athletic teams.

(9) School districts must affirmatively encourage booster clubs to devote comparable attention to the promotion and encouragement of both girls' and boys' sports. In addition, school districts must not give significant assistance to organizations which benefit athletes in a sex-discriminatory manner.

(10) School districts must hire the best available, qualified officials for both girls' and boys' sports and must utilize M.O.A. ratings to comply with this requirement.

(12) If a sport is sanctioned during different seasons for girls and boys, or if a girls' sport is not played in the normal national season, school districts must participate with MHSA in improving recruitment opportunities for those athletes.

(13) School districts must prepare a sex equity in athletics policy, establish a grievance procedure and designate a coordinator. In addition, the policy and information regarding grievance procedures must be disseminated to the student body, faculty and parents and the districts must keep the information on file for use by students and parents.

To promote compliance with these standards, the Settlement Agreement delineated grievance procedures and sanctions to be implemented by OPI and MHSA. According to the agreement, if a grievance filed with OPI results in a finding of discrimination, OPI must report this conclusion to MHSA, which will take all steps reasonably necessary to insure compliance. In addition, any interested person, including MHSA upon its own initiative, may bring a complaint; MHSA will investigate and determine whether the school district is complying with the minimum requirements. MHSA must take all steps reasonably necessary to assure compliance, including declaring the district ineligible for participation in MHSA-sanctioned activities.

Under the Settlement Agreement OPI must answer equity questions and provide interpretations of state and federal law pertinent to the school districts. In addition, OPI must distribute sex equity materi-

al including handbooks, policies, news articles, and grievance procedures. Finally, OPI must provide workshops on an "as needed" basis concerning, for example, teacher-student interaction, evaluating text books for bias, women in history, career awareness, sex equity in athletics, and the myths and reality of women workers.

Also under the agreement OPI itself is to insure that all its publications are free from sex bias. In addition, it must provide school districts with handbooks on equity and self-evaluation, and must maintain a sex equity specialist. Finally, OPI must continue to provide in-house workshops for all OPI sex equity specialists concerning technical assistance to schools. In addition to state-wide activities, OPI agreed to remain active on a national level concerning sex equity issues. This was to include contact on a regular basis with other state education agencies for information and materials with regard to sex equity.

The most hotly contested issue concerned the seasonal placement of girls' basketball and volleyball. In Montana, girls' basketball is played in the fall rather than in the winter as at most colleges and other states' high schools. Volleyball, on the other hand, is played in the winter season, as opposed to the normal fall season. The plaintiffs wanted the seasons changed to the more conventional seasons so that girls could compete with out-of-state athletic teams, compete in tournaments and camps aligned with the conventional seasons, and so that Montana girls could be observed by college recruiters during the national recruiting season.

The defendants resisted the season switch, arguing that the present season plan maximizes student participation in sports, permits the same coaches to coach both girls' and boys' basketball in the smaller Montana schools and puts a lesser burden on the facilities than would be placed on them if both girls' and boys' basketball were played in the same season. The Settlement Agreement left it to the facilitator to determine whether a seasonal change of the two sports was appropriate.

The district court approved the Settlement Agreement on June 20, 1984, and pursuant to the stipulation contained in the agreement, the court ordered the case dismissed without prejudice. Also pursuant to the Settlement Agreement, the court retained continuing jurisdiction to enforce the terms of the agreement.

During the next six months, the facilitator actively investigated the relative athletic opportunities of boys and girls in the Montana high schools and submitted in December of 1984 a report to the district court on the seasons issue.

The facilitator's report concluded that "[o]pportunities for girls to participate in high school athletics in Montana are grossly restricted compared to those same opportunities for boys." He carefully examined the relative advantages and disadvantages to the female players themselves in making the season switch. His report noted that the current seasonal structure was favored by a large majority of Montanans, including the players. It concluded that switching girls' basketball to the winter would be "slightly more advantageous" for the high school girls than the current fall season, and that moving the volleyball season to the fall would be "significantly more advantageous" for the girls than the current winter season. It stated that if the proposed seasons were adopted, the disparity between boys' and girls' athletic opportunities would eventually be reduced, but that the "most significant cause of Montana high school girls' restricted athletic opportunities" is the "sexually biased attitudes of some of the coaches, athletic directors, administrators and others."

In his December 1984 report, the facilitator recommended that the current seasonal structure be retained through the 1985–86 school year. The facilitator recommended that schools switch the seasons in the 86–87 year unless the MHSA asked for review by the district court in the winter of 1986, and, in an evidentiary proceeding, was able to show that equality of athletic opportunity for girls and boys in Montana high schools had been achieved. The possibility of avoiding the seasons change was

clearly intended as incentive to the schools to comply with the Settlement Agreement.

The report went on to set forth specific criteria in order to determine whether the Settlement Agreement had been complied with. The criteria included offering boys and girls the same number of sports, the same length of seasons, the same quality of coaching, equal pay for equal work by coaches, equal recognition of athletic achievements, and equal quality of officiating, recruiting, transportation and booster clubs.

The report was submitted to the district court, and Judge McNichols adopted it in February of 1985. His order provided that defendants begin planning a seasonal change in volleyball and basketball to begin in the 1986–87 school year, but that the MHSA would be able to challenge the need for such a change through a review procedure to be held during the 1985–86 school year.

During the remainder of 1985, the high schools, pursuant to the Settlement Agreement, were active participants in a self-assessment survey of equal athletic opportunity. A report of that survey was submitted in November of 1985 to the facilitator, who visited schools in the state to ascertain the validity of the survey.

In January of 1986, the membership of the MHSA voted to initiate the review procedure in order to try to prove that a change in the girls' basketball and volleyball seasons was not warranted.

Following the MHSA's decision to seek review of the need for a seasons change, the parties went back to the facilitator to discuss the manner in which that hearing should be conducted. The facilitator wrote to the court on January 2, 1986 that the parties had agreed on areas of evidence to be presented at the hearing. Those areas included an analysis of the relative athletic opportunities for boys and girls in the high schools, and the "relationship between the 'seasons issue' and equality of athletic opportunities."

The matter came before Judge Lovell, following Judge McNichols' death. In his pretrial order Judge Lovell adopted the fa-

cilitator's statement of the parties' agreement as to evidence to be presented. He indicated his belief that the court should be fully apprised of all of the facts in the case. He rejected the plaintiffs' contention that the defendants had to prove every high school in the state had achieved absolute equality in order to avoid the 1986–87 season switch. He also rejected defendants' proposal that they need only show that the member schools were addressing the problems.

The evidentiary hearing took place on April 1–4 and April 7, 1986. The nature of the evidence presented to the district court and its detailed findings of fact and conclusions are set forth at length in its published opinion at 633 F.Supp. 1564, which was filed May 8, 1986.

The district court concluded that while substantial steps toward equality had been taken, serious inequities continued. In effect, the court decided that the defendants had not yet complied with the Settlement Agreement. It further concluded, however, that the inequities had little or nothing to do with the seasonal placement of girls' basketball and volleyball. The court decided that an order requiring a season change in the next academic year would not remedy the inequities in the system and that the Settlement Agreement of the parties, and the goal of equality, would be better served by the court's retaining jurisdiction over the case to supervise compliance with the agreement. To that end, the court ordered the appointment of a special master and ordered continued efforts on the part of the Montana High School Association and the Office of Public Instruction to achieve full equality in high school sports.

The plaintiffs appeal from the court's refusal to order a change in the girls' volleyball and basketball seasons beginning with the 1986–87 year.

## THIS APPEAL

As the foregoing discussion indicates, the history of this case in the district court has been a groundbreaking effort on the part of the parties, the court and skilled experts to bring about real and long-lasting changes in athletic programs in the State of Montana. Throughout most of its career in the district court, the case was marked by an absence of formalistic legal arguments and a commendable emphasis upon practical ways to change the operation of school athletics in order to achieve equal opportunities for girls and boys.

In this appeal, however, the parties have resorted to more formalistic arguments which do not fit the pattern of the settlement efforts. Those settlement efforts transformed what could have been expensive and nonproductive litigation into a project with real consequences in the schools. Now, it appears the parties are asking that this court turn their butterfly back into a caterpillar.

Appellants' principal contention on appeal is that the district court violated the "law of the case" when it declined to order the season change after finding that there were still inequities in the system. Plaintiffs focus upon Judge McNichols' 1984 approval of the facilitators' recommendation that the seasons change in 1986–87 unless MHSA could prove in a 1986 hearing that equality had been achieved. Plaintiffs contend acceptance of that recommendation became the "law of the case." The defendants counter that the doctrine of "law of the case" should be applied only to issues which have been decided by an appellate court that has ordered a remand in the proceeding. They argue that Judge Lovell was free to disregard Judge McNichols' prior orders.

The doctrine of "law of the case" is rooted in the concept that courts should generally follow earlier orders in the same case and should be reluctant to change decisions already made, because encouragement of change would create intolerable instability for the parties. *See* 1B *Moore's Federal Practice* ¶¶ 0.404[4.1] at 126, 0.404[4.2] at 127–28, and 20.404[8] at 157–58 (1984). The principle applies to interlocutory decisions of the same or higher tribunals. *Christianson v. Colt Ind. Operating Corp.,* — U.S. —, —, 108 S.Ct. 2166, 2176–78, 100 L.Ed.2d 811 (1988); *A &*

*A Concrete, Inc. v. White Mountain Apache Tribe,* 781 F.2d 1411, 1418 (9th Cir.), *cert. denied,* 476 U.S. 1117, 106 S.Ct. 2008, 90 L.Ed.2d 659, (1986); *Moore v. James H. Matthews & Co.,* 682 F.2d 830, 833 (9th Cir.1982).

■ We therefore do not agree with the appellees' legal contention that the district court in this case was free to disregard the preceding orders of Judge McNichols. We also do not agree with the appellants, however, that the district court was required by the previous order of Judge McNichols to order the season change in this case. Judge McNichols' order was entered in the unique context of this settlement. Its provision on seasons change simply adopted the recommendation of the facilitator, as of 1984, in light of the facilitator's assessment of the situation at that time. It was less an interlocutory adjudication of a factual or legal issue in the case than a plan for projected future action. The order reflected the hopes of the parties, the facilitator, and the district court that by the time any review process was instituted, the situation would have materially changed for the benefit of Montana high school girls. It put no rigid constraints on anyone.

The flexibility of the settlement framework is illustrated by the subsequent conduct of the parties. In the winter of 1986, as the time approached for the hearing on seasons change, the parties went back to the facilitator to discuss how the hearing should be conducted. The parties agreed in their discussions with facilitator Gomberg that the areas of evidence to be presented at the hearing would include "the relationship between the 'seasons issue' and equality of athletic opportunities." That is essentially what the district court proceeded to decide. We cannot hold that its decision is inconsistent with Judge McNichols' earlier order based upon the settlement of the parties and the recommendation of the facilitator at that time, or with the parties' later agreement with the facilitator prior to the hearing.

Appellants mount a related challenge to the evidentiary rulings of the district court which permitted evidence of the effects of the proposed seasons change and efforts of the school districts to achieve equality. Plaintiffs maintained in motions to the district court and maintain in their appeal to this court that the district court should not have considered evidence concerning the advantages and disadvantages to the girls of the seasons change. They contend that the court should have limited itself to determining whether the opportunities for boys and girls in all of the high schools of the state were otherwise equal.

■ The district court explained in its pretrial order, however, that it rejected both the plaintiffs' and the defendants' characterization of the defendants' burden. The court tried to steer a middle course. In its pretrial order, the district court stated as follows:

> The court does not intend to adopt a rigid standard of proof to which the parties will be bound without flexibility. All relevant evidence will be considered in determining the existence of overall equality of athletic opportunity.

> I intend to examine the relative interest of girls and boys in athletics, the quantity and quality of participation in athletics by girls relative to boys, and the efforts made by state and school officials to improve the girls' opportunities to participate in athletics.

In view of our holding that the settlement of the parties created a flexible framework in which the parties, with the assistance of the facilitator and the court were to try to achieve equality of athletic opportunity, we hold that the district court did not abuse its discretion in admitting the evidence showing the effects of the proposed seasons change and the efforts of the schools to achieve equality. The evidence was relevant to at least one of the issues that the parties and the facilitator agreed should be considered: "the relationship between the 'seasons issue' and equality of athletic opportunities."

In its decision following the hearing, the district court, however, addressed more than the matters which it had considered appropriate for resolution in the pretrial

order. It went on to determine the federal constitutional question of whether the seasons policy itself violated the fourteenth amendment's guarantee of equal protection of the law. The district court concluded that it did not. *Ridgeway*, 633 F.Supp. at 1581. Appellants' final contention in this appeal is that the district court should have concluded that the present seasons policy violates the equal protection guarantee of the fourteenth amendment.

 Plaintiffs ask us to apply the intermediate level of scrutiny which the Supreme Court has held appropriate to classifications based upon sex. *See Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976). Under that standard, the state must show that it has important governmental objectives and that its means are substantially related to the achievement of those objectives. *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982).

The difficulty with plaintiffs' position, however, is that the procedures which the parties agreed to follow in this case never contemplated that the seasons issue would be decided in isolation as a matter of federal equal protection analysis. Rather, throughout most of its history, this litigation has focused upon the entire range of athletic opportunities for girls. This has no doubt been due in part to the stringent standards for equality established by Title IX of the Education Amendments of 1972 and provisions of the Montana Constitution guaranteeing equality of educational opportunities and equal rights for women. *See Ridgeway*, 633 F.Supp. at 1581.

Thus, whether or not the season placement alone violated equal protection was not an issue in the original Settlement Agreement of the parties; it was not referred to in orders of Judge McNichols; it was not a part of the pretrial order of Judge Lovell. Indeed, the plaintiffs in their pretrial motions and during the evidentiary hearing itself contended that the

merits of the seasons change should not even be considered. Defendants urged that the seasons placement issue be viewed in relation to all of the other school athletic practices.

We thus agree with the plaintiffs insofar as they contend that the district court should not have decided that seasons placement did not violate equal protection. The issue was not properly before the court. We therefore express no opinion on its appropriate resolution in this or any other context in which seasonal placement of girls' sports may be an issue.

The district court's order embodied its decision that the schools must continue their efforts to bring about equality in athletics, and that the court should retain jurisdiction of the case to monitor progress. The court declined to order the girls' basketball and volleyball seasons realigned in the 1986–87 school year but did not rule out such an order for future years.[1] Its ruling in this regard serves the purposes of the Settlement Agreement. The possibility of such a court ordered season change in the future should act as a continuing incentive to the schools to improve athletic opportunities for high school girls in Montana.

AFFIRMED.

BEEZER, Circuit Judge, concurring:

I concur in the result.

Appellants did not seek, and the district court did not deny, a preliminary injunction to switch the seasons. *See Ridgeway v. Montana High School Ass'n*, 633 F.Supp. 1564 (D.Mont.1986). On appeal neither party invoked the test for a preliminary injunction: "probable success and the possibility of irreparable harm" or the like. *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987).

That leaves two alternatives. Either the district court administered an aspect of the parties' settlement agreement, or the district court denied a permanent injunction.

---

1. Notwithstanding statements contained in Judge Beezer's special concurrence, nothing in this opinion should be viewed as foreclosing the district court from considering the seasons' issue in the future.

First: if the district court merely administered an aspect of the settlement agreement, we lack jurisdiction. The district court's order would be neither a final decision affording jurisdiction under 28 U.S.C. § 1291, nor a decision on an injunction affording jurisdiction under 28 U.S.C. § 1292(a)(1). Second: if the district court denied a permanent injunction, we have jurisdiction under 28 U.S.C. § 1292(a)(1). This appeal would settle the issue of switching seasons.

The district court's order did not merely administer an aspect of the settlement agreement; the parties consistently have treated switching seasons as a separate issue. Here appellants sought a permanent injunction to switch the seasons, and the district court denied the injunction.

The next question concerns the scope of the district court's order. The order could be interpreted as denying a permanent injunction to apply only during the 1986–87 season:

> 1. The girls' high school basketball program in Montana shall remain in the fall and the high school volleyball program shall remain in the winter for the 1986–87 school year.

*Ridgeway,* 633 F.Supp. at 1583. If the injunction was to apply only during the 1986–87 season, this appeal is moot, and we lack jurisdiction. After all, the 1986–87 season is over.

The logic of the district court's opinion, however, is to deny a permanent injunction for the 1986–87 season and all subsequent seasons. The district court concluded that "merely requiring reversal of the seasons ... will do nothing to remedy the inequities the Court has found to exist." *Ridgeway,* 633 F.Supp. at 1582–83. As this statement indicates, the present appeal is not moot— but only because the district court denied appellants' request for a permanent injunction once and for all.

Today we affirm the district court. If tomorrow appellants again may request a permanent injunction, and the district court may grant one, our decision today is meaningless. At some point appellants may be able to obtain relief under Federal Rule of Civil Procedure 60(b) (relief from order in extraordinary circumstances). Otherwise, in affirming the district court's denial of a permanent injunction, we necessarily foreclose further judicial oversight of the sequence of Montana high school girls' basketball and volleyball seasons.